## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————————————

| | |
|---|---|
| TEVA PHARMACEUTICALS USA, Inc.,<br>  1090 Horsham Road,<br>  North Wales, PA 19454, | ) <br> ) <br> ) <br> ) |
|         Plaintiff, | )      Case No. _____ |
|   v. | ) |
| ALEX M. AZAR II, in his official capacity<br>as Secretary of Health and Human Services,<br>  200 Independence Ave. S.W.<br>  Washington, DC 20201; | ) |
| SCOTT GOTTLIEB, M.D., in his official<br>capacity as Commissioner of Food and Drugs,<br>  10903 New Hampshire Ave.,<br>  Silver Spring, MD 20903; | ) |
| UNITED STATES FOOD AND DRUG<br>ADMINISTRATION,<br>  10903 New Hampshire Ave.,<br>  Silver Spring, MD 20903, | ) |
|         Defendants. | ) |

———————————————————————————

## TEVA PHARMACEUTICALS USA, INC.'S COMPLAINT FOR
## DECLARATORY AND INJUNCTIVE RELIEF

Teva Pharmaceuticals USA, Inc. ("Teva") brings this complaint for declaratory and injunctive relief against Defendants Alex M. Azar II, in his official capacity as Secretary of Health and Human Services; Scott Gottlieb, M.D., in his official capacity as Commissioner of Food and Drugs; and the United States Food and Drug Administration (collectively "FDA"). In support thereof, Teva states the following:

## NATURE OF THE ACTION

1.     This lawsuit seeks immediate injunctive and declaratory relief that will bar FDA from depriving plaintiff Teva Pharmaceuticals USA, Inc. ("Teva") of its statutory right to 180 days of marketing exclusivity for its generic version of the brand-name drug Restasis®.  Teva earned that reward because it was the first generic applicant that complied with the Hatch-Waxman Act's requirements for challenging at least one of the patents covering Restasis®.  Yet FDA now has ruled that an applicant which concededly ***did not*** comply with those requirements (and so assumed ***no risk*** of patent infringement litigation) nonetheless qualified for 180-day exclusivity—and thereby blocks every company which ***did*** comply with the statute (and ***realized the risk*** of infringement litigation) from qualifying for the exclusivity period Congress intended as a "reward for generics that stick out their necks (at the potential cost of a patent infringement suit)."  *Teva Pharms. USA, Inc. v. Sebelius*, 595 F.3d 1303, 1318 (D.C. Cir. 2010).

2.     That perverse result is remarkable in its own right.  But it is particularly startling because FDA took precisely the opposite position for nearly two decades.  Until now, FDA consistently maintained that eligibility for 180-day exclusivity hinges on a generic applicant submitting a legally valid challenge to the innovator's patents that complies with all statutory requirements for such challenges—including the requirement to notify the brand manufacturer of any such challenge so that it can evaluate whether to sue the generic applicant for patent infringement.  Not surprisingly, both this Court and the D.C. Circuit agreed with that commonsense position.  *See, e.g., TorPharm, Inc. v. Thompson*, 260 F.

2

Supp. 2d 69, 80 (D.D.C. 2003), *aff'd sub nom. Purepac Pharm. Co. v. Thompson*, 354 F.3d 877, 888-89 (D.C. Cir. 2004).

3.     While this case arises under a more recent version of the statute than the one FDA and the courts considered in those decisions, FDA recently promulgated binding regulations—after formal notice-and-comment rulemaking—that not only affirmed its longstanding position, but expressly relied on the court cases upholding that well-settled rule. *Abbreviated New Drug Applications and 505(b)(2) Applications—Final Rule* (the "MMA Final Rule"), 81 Fed Reg. 69580, 69609 (Oct. 6, 2016) (adopting proposed rule that applicants must "satisfy the notice requirement of the [Hatch-Waxman] Act … to qualify for 180-day exclusivity"); *see also Abbreviated New Drug Applications and 505(b)(2) Applications—Proposed Rule* (the "MMA Proposed Rule"), 80 Fed. Reg. 6802, 6835 (Feb. 6, 2015) (citing *Purepac* to support proposal that a patent challenge is "effective only as of the date that the applicant has both submitted … the paragraph IV certification and sent the notice"). FDA's attempt to jettison that rule in the context of a quasi-adjudicatory proceeding is thus as procedurally defective as it is substantively baffling.

4.     Immediate judicial review of FDA's decision and prompt injunctive relief are essential. As set forth in greater detail below, FDA already has applied its decision to strip Teva of its statutory right to 180-day exclusivity for at least one generic drug product, and there is no question that FDA's decision will have exactly the same effect here. Teva thus faces the same significant, imminent, and well-recognized irreparable harm from FDA's decision that has led the courts to enjoin

3

prior FDA decisions—the loss of its statutory right to 180-day exclusivity and **tens of millions of dollars** that Teva can never recover from either FDA or its competitors. That is so, as both this Court and the D.C. Circuit have recognized, because it is impossible to remediate the loss of 180-day exclusivity once competing products enter the market: "[A] first applicant's loss of its statutory entitlement to the 180-day exclusivity period is irreparable because once lost 'it cannot be recaptured.'" *Mylan Labs. Ltd. v. FDA*, 910 F. Supp. 2d 299, 313 (D.D.C. 2012) (quoting *Apotex, Inc. v. FDA*, No. Civ. A. 06-627, 2006 WL 1030151, at *17 (D.D.C. Apr. 19, 2006), *aff'd*, 449 F.3d 1249 (D.C. Cir. 2006)); *Teva v. Sebelius*, 595 F.3d at 1311 ("If we refrained from adjudicating this dispute now, Teva [faces] an injury that would not be remedied by Teva's securing 180 days of exclusivity later on.").

5. Consistent with this well-settled precedent, this Court immediately should declare that FDA's decision is in excess of FDA's statutory authority, arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law, and enter an injunction barring FDA from depriving Teva of its statutory right to 180-day exclusivity for generic versions of Restasis® and compelling FDA to proceed on Teva's ANDA for its generic version of Restasis® in a manner not inconsistent with this Court's ruling.

## PARTIES

6. Plaintiff Teva is a Delaware corporation with its principal place of business in North Wales, Pennsylvania. Teva is a wholly-owned, indirect subsidiary of Teva Pharmaceutical Industries Ltd., a global pharmaceutical company organized under the laws of Israel with its principal place of business in

4

Israel.  Teva is an industry leader in the development, manufacture, and marketing of generic pharmaceuticals in the United States.

7.     Defendant Alex M. Azar II is the Secretary of Health and Human Services ("HHS") and is the official charged by law with administering the FDCA. Secretary Azar is sued in his official capacity.  He maintains offices at 200 Independence Ave., S.W., Washington, DC 20204.

8.     Defendant Scott Gottlieb, M.D., is the Commissioner of Food and Drugs and has the delegated authority to administer the drug approval provisions of the Food, Drug, and Cosmetic Act ("FDCA").  Commissioner Gottlieb is sued in his official capacity.  He maintains offices at 10903 New Hampshire Ave., Silver Spring, MD 20903.

9.     Defendant FDA is the agency within HHS charged with overseeing, *inter alia*, the human drug approval process, including the portions of that process relevant to this case.  Its headquarters is located at 10903 New Hampshire Ave., Silver Spring, MD 20903.

## JURISDICTION AND VENUE

10.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331.  This action arises under the FDCA, 21 U.S.C. §§ 301 *et seq*., as amended by the Drug Price Competition and Patent Term Restoration Act of 1984 (the "Hatch-Waxman Act" or "Hatch-Waxman") and the Medicare Modernization Act of 2003 ("MMA"), codified *inter alia* at 21 U.S.C. § 355 *et seq*.; the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 555, 702, and 706; and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.

11.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e).

## FACTUAL ALLEGATIONS

### A.      The Hatch-Waxman Framework

#### 1.      Overview

12.     As modified by the Hatch-Waxman Act and the MMA, the FDCA establishes the procedure for obtaining FDA approval to sell pharmaceutical products.   21 U.S.C. § 355 *et seq.*   To obtain approval for brand-name drugs like Restasis®, manufacturers must file a New Drug Application ("NDA") that contains clinical-trial data establishing the proposed drug's safety and efficacy.   *Id.* § 355(b)(1).[1]

13.     Before Hatch-Waxman, generic applicants likewise had to conduct new clinical trials and file full NDAs—even though generic drugs contain the same active pharmaceutical ingredients ("APIs") as their brand-name equivalents and have the same safety and efficacy profile.   That made generic market entry cost-prohibitive, and patients therefore lacked access to affordable generic medicines. Hatch-Waxman sought to remove those barriers, increase the availability of generic drugs, and reduce prescription drug costs.   *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1326 (D.C. Cir. 1998).

14.     To do so, it authorizes FDA to approve a generic version of a previously-approved drug so long as the proposed generic drug is "the same as" a previously-approved drug in certain key respects—the chemical composition of its

---

[1] Unless otherwise noted, all citations are to the current version of the statute.

API; the rate at which its API is released into the body (called "bioequivalence" or "BE"); the drug's strength (*e.g.*, 50mg or 100mg of API); its route of administration (*e.g.*, oral or injected); its form (*e.g.*, tablet or capsule); and its labeling. 21 U.S.C. § 355(j)(2)(A). Generic applicants seek approval for their products by submitting Abbreviated New Drug Applications ("ANDAs") with data establishing those characteristics. If a proposed generic product meets these "sameness" criteria, the applicant need not conduct new clinical trials; instead, FDA can approve the product based on its prior finding that the generic drug's brand-name equivalent is safe and effective. *Id.* § 355(j)(2)(A); *see also Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1063 (D.C. Cir. 1998).

### 2. The "Paragraph IV" Patent-Challenge Process

15. At the same time Hatch-Waxman sought to speed generic approvals, it recognized that brand manufacturers often hold valuable patents on their products. Hatch-Waxman thus struck a balance between expediting generic entry and respecting innovators' patent rights. Whenever a brand manufacturer believes it holds valid patent rights on an approved drug, Hatch-Waxman requires that company to file with FDA "the patent number and the expiration date of any patent which claims the drug … and with respect to which a claim of patent infringement could reasonably be asserted [against a generic competitor]." 21 U.S.C. § 355(b)(1); *see also* 21 C.F.R. § 314.50(h). The statute then obligates FDA to "publish" and regularly "revise" a list of all such patent data. *Id.* § 355(j)(7)(A)(i)-(iii); *see also id.* § 355(c)(2). FDA does so in a resource known as "the Orange Book." *Purepac*, 354 F.3d at 880; *Am. Bioscience, Inc. v. Thompson*, 243 F.3d 579, 580 (D.C. Cir. 2001).

These intertwined patent-submission and patent-listing requirements thus allow prospective ANDA applicants to identify patent barriers that might bar them from entering the market even after FDA approves their products.

16. Congress also recognized that the U.S. Patent and Trademark Office ("PTO") sometimes issues patents that are not valid or cannot be enforced, and that generic applicants often seek approval for products that will not infringe the listed patents—in which case those patents should not delay generic entry. To speed the resolution of patent disputes between brands and generics so that competition can start as soon as the law permits, Congress required each ANDA to include "a certification … with respect to each [Orange Book-listed] patent which claims the listed drug … or … a use for such listed drug." *Id.* § 355(j)(2)(A)(vii); *see also* 21 C.F.R. § 314.53(f). Four such certifications are available:

(I) that no patent information was filed for the referenced NDA [a "Paragraph I certification"],

(II) that a listed patent has expired [a "Paragraph II certification"],

(III) that the generic drug will not be marketed until a listed patent is set to expire [a "Paragraph III certification"], or

(IV) that a listed patent is invalid or will not be infringed by the manufacture, use, or sale of the proposed generic drug [a "Paragraph IV certification"].

21 U.S.C. § 355(j)(2)(A)(vii).

17. Paragraph IV certifications play a vital role in the statutory scheme. These certifications signal that a generic applicant disputes the innovator's patent rights and therefore intends to enter the market before a listed patent is set to expire. *Teva Pharm. USA, Inc. v. Leavitt*, 548 F.3d 103, 106 (D.C. Cir. 2008) (*Teva*

*v. Leavitt*) ("The legislative purpose underlying paragraph IV is to enhance competition by encouraging generic drug manufacturers to challenge the patent information provided by NDA holders in order to bring generic drugs to market earlier."). But in crafting the Paragraph IV challenge process, Congress recognized that merely telling FDA that a listed patent is invalid, unenforceable, or would not be infringed accomplishes nothing on its own. FDA, after all, does not resolve patent disputes; the federal courts do. And before Hatch-Waxman, the federal courts lacked jurisdiction to adjudicate patent disputes before a generic applicant risked potentially ruinous liability (including potential treble damages) by committing acts of actual infringement. 35 U.S.C. § 271(a) (cause of action for infringement); *id.* § 284 (treble damages). That made it impossible for generic applicants to obtain certainty about their rights without risking damages—and the shadows cast by dubious patents in turn threatened to delay the launch of approved generics that otherwise could have been on the market.

18.     So Hatch-Waxman engineered a fix. To help generics obtain certainty about a listed patent's coverage without subjecting them to the *in terrorem* threat of massive damages, the statute deemed an ANDA applicant's submission of a Paragraph IV certification to FDA to be a "highly artificial" act of patent infringement that immediately can be litigated without subjecting the generic applicant to damages. 35 U.S.C. § 271(e); *Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 678 (1990) ("Quite obviously, the purpose of [35 U.S.C. § 271](e)(2) and (e)(4) is to enable the judicial adjudication upon which the ANDA and paper NDA

schemes depend."). And because that fix would enable the resolution of pre-launch patent disputes only if the brand manufacturer learns that an applicant has submitted a Paragraph IV certification (and so can be sued), Hatch-Waxman naturally required generic applicants to notify the brand manufacturer and any registered patentee(s) when they submit Paragraph IV certifications to FDA. 21 U.S.C. § 355(j)(2)(B)(i)-(ii). Where an ANDA applicant submits a Paragraph IV certification in its original ANDA, such notice must be provided "not later than 20 days after the date … [on] which [FDA] informs the applicant that the application has been filed." *Id.* § 355(j)(2)(B)(ii)(I). And where an applicant submits a Paragraph IV certification by amending a previously-filed ANDA, it must notify the innovator "at the time at which the applicant submits the amendment or supplement" to FDA. *Id.* § 355(j)(2)(B)(ii)(II).

19. Because the whole point of Hatch-Waxman's patent-submission, patent-listing, Paragraph IV certification, and Paragraph IV notice provisions is to resolve patent disputes before FDA approval, the statute incentivizes brand manufacturers to sue as soon as they receive the legally-required notice. Indeed, the entire Paragraph IV scheme is keyed to the innovator's receipt of the legally-required notice. Where the brand manufacturer sues within 45 days of receiving the legally-required notice, FDA may not approve the ANDA until 30 months after the brand manufacturer receives the legally-required notice. 21 U.S.C. § 355(j)(5)(B)(iii). This incentive is known as a "30-month stay." *Eli Lilly & Co. v. Teva Pharms. USA, Inc.*, 557 F.3d 1346, 1348-49 (Fed. Cir. 2009). Where, by

contrast, the brand manufacturer declines to file suit, the generic applicant can itself initiate a declaratory-judgment action to obtain certainty about its rights—but only after 45 days have elapsed from the brand manufacturer's receipt of the legally-required notice.  21 U.S.C. § 355(j)(5)(C)(i)(I)(aa).  Whether such litigation is initiated by the brand manufacturer or generic applicant, however, an applicant that prevails in the district court (like Teva did here) can obtain FDA approval immediately—even if a 30-month stay otherwise would bar approval; even if the challenged patent won't expire for several years; and even if an appeal is pending.  *Id.* at § 355(j)(5)(B)(iii).

### 3.    The 180-Day Exclusivity Reward

20.    Because Paragraph IV certifications are all about producing potential litigation over a challenged patent, *bona fide* Paragraph IV applicants necessarily assume significant risks.  Beyond making the initial investments needed to develop either a non-infringing formulation that meets the statute's "sameness" requirements or a viable legal challenge to a listed patent, valid Paragraph IV applicants must be prepared to defend their proposed product in years of costly patent litigation.  But because successful patent challenges can open the market to early generic competition, Congress encouraged generic applicants to take on those risks.  To that end, Hatch-Waxman rewards the first generic applicant that submits a valid Paragraph IV challenge and thereby subjects itself to the risk of infringement litigation with a 180-day period of marketing exclusivity during which FDA may not approve any subsequently-filed ANDA referencing the same brand-name drug.  As the D.C. Circuit has explained, this exclusivity period

is a pro-consumer device [that] Congress has chosen to induce
challenges to patents claimed to support brand drugs.  The statute
thus deliberately sacrifices the benefits of full generic competition at
the first chance allowed by the brand manufacturer's patents, in favor
of the benefits of earlier generic competition, brought about by the
promise of a reward for generics that stick out their necks (at the
potential cost of a patent infringement suit) by claiming that patent
law does not extend the brand maker's monopoly as long as the brand
maker has asserted.

*Sebelius*, 595 F.3d at 1318.

21.    Needless to say, such "[m]arketing exclusivity is valuable." *Teva v.
Leavitt*, 548 F.3d at 104.  By allowing the first generic patent challenger to enter the
market without competition for six months, this exclusivity can be worth tens (or
even hundreds) of millions of dollars when it comes to top-selling drugs like
Restasis®—for which brand manufacturer Allergan, Inc.'s net revenues exceeded
$1.4 billion in 2017.  *Allergan Reports Solid Finish to 2017 with 12% Increase in
Fourth Quarter GAAP Net Revenues to $4.3 Billion*, Feb. 6, 2018, *available at*
https://tinyurl.com/AllerganEarningsRelease (last visited Oct. 16, 2018) (reporting
$1,412,300,000 in 2017 net revenues from U.S. sales of Restasis®).

### a.    The Pre-MMA 180-Day Exclusivity Provisions

22.    Before Congress enacted the MMA in 2003, Hatch-Waxman
established this 180-day exclusivity reward by delaying FDA approval of any ANDA
that "contains a [Paragraph IV] certification … and is for a drug for which a
previous [ANDA] has been submitted under this subsection cont[ain]ing such a
certification" until 180 days after the first Paragraph IV challenger either prevailed
in its patent case or began selling its drug.  21 U.S.C. § 355(j)(5)(B)(iv) (pre-2003).
Given the central role that notice of a Paragraph IV certification plays in making

Hatch-Waxman's litigation engine work, FDA consistently held that Paragraph IV certifications are legally invalid—and so cannot qualify an applicant for 180-day exclusivity—unless the applicant timely notifies the brand manufacturer of its Paragraph IV certification in accordance with the statute's mandatory notice requirements:

> [T]he statute makes the first applicant to submit a paragraph IV certification to a patent eligible for exclusivity, and it also requires that the ANDA applicant give notice. [In determining] the relevant date for exclusivity purposes…, the agency will look to the date that [the first applicant] actually sent the required notice, since this is the date upon which [the first applicant] effectively met the statutory requirements by having both submitted a paragraph IV certification and sent notice of the submission.

Letter from G. Buehler to ANDA Applicants for Gabapentin (the "Gabapentin Letter Decision") at 7-8 (Jan. 28, 2003).

23. This structural interpretation of the law was challenged, but both this Court and the D.C. Circuit affirmed FDA's position as appropriately recognizing that Hatch-Waxman's patent-listing, patent-certification, Paragraph IV notice, and 180-day exclusivity provisions are inextricably intertwined. *TorPharm*, 260 F. Supp. 2d at 80 (affirming FDA's decision as recognizing "that notice and certification must occur together, and therefore refus[ing] to give legal recognition to one act until the other has been effectuated as well"), *aff'd Purepac*, 354 F.3d at 888-89. Since that time, FDA repeatedly has affirmed this interpretation. *See, e.g.*, Letter from K. Uhl to Celecoxib ANDA Applicants (the "Celecoxib Letter Decision") at 2 n.6 (Apr. 24, 2014) ("[F]or exclusivity purposes ... the agency will look to the date the applicant actually sent the required notice, since that is the date the

applicant effectively met the statutory requirements by having both submitted a paragraph IV certification and sent notice of the submission.").

### b.    The Post-MMA 180-Day Exclusivity Provisions

24.    Congress updated the original Hatch-Waxman Act in 2003.  Like the original statute, the MMA grants the first Paragraph IV applicant a 180-day exclusivity period by barring FDA from approving a subsequently-filed Paragraph IV ANDA until "180 days after the date of the first commercial marketing of the drug ... *by any first applicant*."  21 U.S.C. § 355(j)(5)(B)(iv)(I) (emphasis added).  That term had not appeared in the original statute (which as set forth earlier awarded exclusivity to the first generic applicant by reference to the submission of "a previous application cont[ain]ing a Paragraph IV certification"), so the amended statute defined "first applicant" as "an applicant that, on the first day on which a substantially complete application containing a [Paragraph IV] certification ... is submitted for approval of a drug, [1] submits a substantially complete application that [2] contains and [3] lawfully maintains a [Paragraph IV] certification ... for the drug."  *Id*. § 355(j)(5)(B)(iv)(II)(bb).

25.    For more than a decade after the MMA's enactment, FDA declined to implement the MMA's amendments through notice-and-comment rulemaking.  Instead, it opted to resolve legal questions that arose under the MMA on a case-by-case basis, through informal letter rulings—occasionally after seeking comment from interested parties, but often not.  On February 6, 2015, however, FDA proposed new regulations that expressly sought to maintain FDA's pre-MMA rule

that proper notice of a Paragraph IV certification is necessary to qualify for 180-day

exclusivity—even invoking the D.C. Circuit's *Purepac* decision for support:

> [T]he controlling date for purposes of first applicant eligibility is the date on which the amendment or supplement to the ANDA containing a paragraph IV certification is submitted (i.e., officially received (date-stamped) by the OGD Document Room) ***as long as notice is timely provided in accordance with the statute***…. If an ANDA applicant does not provide notice of a paragraph IV certification [in accordance with the applicable statutory deadline for doing so], ***FDA will consider the paragraph IV certification to be effective only as of the date that the applicant has both submitted … the paragraph IV certification and sent the notice (see Purepac Pharmaceutical Co. v. Thompson, 354 F.3d 877 (D.C. Cir. 2004))***.

80 Fed Reg. at 6835 (emphasis added).

26. FDA didn't merely announce this rule in the MMA Proposed Rule's

preamble; it incorporated that rule directly into its proposed regulations: "***If an***

***ANDA applicant's notice of its paragraph IV certification is timely provided***

***in accordance with paragraph (b) of this section***, FDA will base its

determination ***of whether the applicant is a first applicant*** on the date of

submission of the amendment containing the paragraph IV certification." *Id*. at

6890 (emphasis added) (proposed 21 C.F.R. § 314.95(d)(2)). Other proposed rules

likewise reflected FDA's adherence to its pre-MMA position that qualifying for 180-

day exclusivity hinges on timely notice of a Paragraph IV certification. *See id*. at

6835-36 (proposing rule that ANDA applicants cannot dispatch notice of a

Paragraph IV certification until "the first working day after the day the patent is

listed in the Orange Book" because "the opportunity ***to be a first applicant*** with

respect to a patent that is newly listed in the Orange Book ***(i.e., to submit an***

***amendment to the ANDA containing a paragraph IV certification <u>and</u> send***

15

*notice of the paragraph IV certification on that same day)* could be affected by, among other things, the time zone in which the ANDA applicant resides") (citing proposed 21 C.F.R. §§ 314.95(b)(2) and 314.94(a)(12)(viii)(C)(1)(ii); emphases added).

27.    After receiving comments, FDA finalized its proposed regulations without relevant alteration on October 6, 2016. *See* 81 Fed. Reg. 69580.  Indeed, FDA's Final Rule expressly reiterated that applicants must dispatch "notice within the required timeframe … to satisfy the notice requirement of the FD&C Act ***and, in the case of a first applicant, to qualify for 180-day exclusivity***," and altered the text of the relevant regulations only to underscore that first-applicant status requires "***an ANDA applicant's notice of paragraph IV certification [to be] timely provided***."   *Id.* at 69609-10 (emphasis added); *see also* 21 C.F.R. § 314.95(d)(2) ("***If an ANDA applicant's notice of its paragraph IV certification is timely provided***…, FDA will base its determination of whether the applicant is a first applicant on the date of submission of the amendment containing the paragraph IV certification.") (emphasis added).

28.    By October 2016, then, FDA had adopted formal regulations—through APA notice-and-comment rulemaking—making clear (A) that, as under the original statute, post-MMA eligibility for 180-day exclusivity hinges on timely providing the legally-required notice of a Paragraph IV certification, and (B) that, in determining whether a Paragraph IV challenger qualifies as an exclusivity-eligible "first applicant," an applicant would be credited only, and so long as, it timely provides notice in accordance with both the MMA and FDA's regulations.

**B.    Facts Related to Restasis® and Generic Cyclosporine Products**

**1.    Restasis®**

29.    Restasis® (cyclosporine ophthalmic emulsion) is "indicated to increase tear production in patients whose tear production is presumed to be suppressed due to ocular inflammation associated with keratoconjunctivitis sicca."  Restasis® Full Prescribing Information, at l (July 2017 ed.), *available at* https://www.allergan.com/assets/pdf/restasis_pi.pdf (last visited October 16, 2018).   FDA first approved Restasis® on December 23, 2002 under NDA No. 050790, and Allergan initially listed two patents in the Orange Book: U.S. Patent Nos. 4,839,342 ("the '342 patent"), which expired August 2, 2009, and 5,474,979 ("the '979 patent"), which expired May 17, 2014.

**2.    Initial Developments Regarding Teva's ANDA**

30.     On January 23, 2012, Teva submitted its cyclosporine ANDA to FDA. At that time, FDA had not yet released any guidance recommending the tests ANDA applicants should perform or the standards they should satisfy in attempting to demonstrate BE to Restasis®.  Consistent with FDA's longstanding position that such guidance is non-binding even when finalized and that applicants always remain free to use alternative approaches, *see* 21 C.F.R. § 10.115(d), Teva's ANDA thus included substantial data and provided a detailed justification explaining why its data and analytical methods were sufficient to demonstrate its product's chemical equivalence and BE to Restasis®.   Finally, Teva's ANDA included a Paragraph III certification to the '979 patent, which by then was the only unexpired patent listed in the Orange Book.

31.     Once Teva submitted its ANDA, FDA began its customary pre-filing review of Teva's ANDA for "substantial completeness," which entails a threshold assessment of whether the as-submitted ANDA is "on its face is sufficiently complete to permit a substantive review and contains all the information required by [21 U.S.C. § 355(j)](2)(A)."   21 U.S.C. §355(j)(5)(B)(iv)(II)(cc); *see also* 21 C.F.R. § 314.101(b)(1).  That process, however, was plagued by irregularities.  On April 19, 2013 (more than a year after Teva submitted its ANDA), FDA requested additional information from Teva—nearly all of which had been provided in Teva's original ANDA.  Letter from M. Shimer to Teva (the "IR"), at 1 (Apr. 19, 2013).  Teva contacted FDA on May 1, 2013 to discuss the IR, and on May 9, 2013 submitted a formal response (A) identifying where the original ANDA included the requested information and (B) either re-providing or summarizing the information already contained in Teva's ANDA.  Letter from P. Jaworski to K. Uhl (the "IR Resp."), at 1-6 (May 9, 2013).

32.     While FDA was considering Teva's IR Response, the Agency published its first draft BE guidance document for Restasis®-referencing ANDAs in June 2013.  *See* FDA, Draft Guidance on Cyclosporine (the "June 2013 Draft Guidance") (June 2013 ed.).  FDA then notified Teva that it was refusing to file (or "receive") the company's ANDA because Teva's ***January 2012*** ANDA "ha[d] not demonstrated bioequivalence [to] the RLD" in accordance with the methods FDA recommended in its ***June 2013*** Draft Guidance.  Letter from W. Rickman & M.

Shimer to Teva (the "RTR Letter") at 1 (Sept. 5, 2013).  The RTR Letter directed

Teva to "follow the draft guidance" and resubmit its ANDA.  *Id.*

33.     That development was doubly problematic.  ***First***, and as noted above,

such guidance documents aren't binding even when finalized, and FDA's review for

substantial completeness is not in any event supposed to evaluate whether a

submitted ANDA actually "demonstrated bioequivalence [to] the RLD."    *Id.*

Instead, the relevant question is whether the submitted ANDA is facially

sufficient—meaning that it makes a plausible effort to show BE:

> This assessment [for substantial completeness] does ***not*** involve
> evaluating whether the data and information in the ANDA are in fact
> sufficient to demonstrate that the [ANDA] meets a requirement for
> approval, such as bioequivalence.  Rather, the assessment involves
> evaluating whether the data and information in the ANDA are the
> types of data and information that could plausibly support an approval
> action and hence merit further review by the Agency.

FDA Docket No. 2015-P-0065-0027, at 39 (Feb. 10, 2016) (emphasis added); *see also*

21 C.F.R § 314.101(d)(3) (allowing FDA to refuse to receive an ANDA only if "it does

not ***on its face*** contain information required") (emphasis added).  FDA's refusal

even to receive Teva's ANDA for review because it "has not demonstrated

bioequivalence" violated that rule.

34.     ***Second***, FDA's RTR decision jeopardized Teva's ability to qualify for

180-day exclusivity.  Though Teva's original ANDA had contained only a non-

exclusivity-qualifying Paragraph III certification to the '979 patent, Allergan had

filed a new Restasis®-related patent application with the PTO shortly after FDA

issued its RTR Letter and—while Teva was considering its response to the RTR

Letter—PTO announced that it would issue U.S. Patent No. 8,629,111 ("the '111 patent") on January 14, 2014.  Official Gazette of the PTO (Dec. 12, 2013).  Because Teva believed Allergan's forthcoming patent was vulnerable to challenge, Teva naturally wanted to submit a Paragraph IV certification that could qualify it for exclusivity and enable the company to bring a lower-cost generic version of Restasis® to market before the '111 patent's scheduled expiry.  But if Teva were forced to submit a new ANDA based on the June 2013 Draft Guidance and another applicant challenged the '111 patent in the interim, Teva would not be eligible for exclusivity—and indeed could be delayed in launching its generic version of Restasis® at the conclusion of FDA's review process.

35.    On January 13, 2014, Teva therefore asked FDA to vacate its RTR decision and receive Teva's previously-submitted ANDA so that the company could challenge the '111 patent as soon as Allergan listed it.  Letter from S. Tomsky to K. Uhl (the "Rescission Request") at 1-2 (Jan. 13, 2014).  Beyond providing a legal rationale for vacating the RTR decision, Teva informed FDA that it would "begin submitting Paragraph IV certifications to the '111 patent upon issuance, in order to fully preserve its rights if and when FDA grants the relief requested." *Id.* at 2.  On January 14, 2014—the same day that PTO issued the '111 patent and Allergan listed it in the Orange Book—Teva therefore amended its ANDA to include a Paragraph IV certification to the newly-issued and newly-listed '111 patent.  Letter from S. Tomsky to K. Uhl (the "P-IV Amendment"), at 1-2 (Jan. 14, 2014).

Accordingly, Teva challenged the '111 patent on the first possible day—*i.e.*, the first day the '111 patent was submitted for listing in the Orange Book.

36.  Because Teva's Paragraph IV certification was contained in an amendment to its previously-submitted-but-not-yet-received ANDA, the statute ordinarily would have required Teva to notify Allergan of its certification at the same time it submitted its amendment to FDA. *Supra* at ¶ 18 (discussing 21 C.F.R. § 314.95(d)). But FDA consistently has held that applicants may not dispatch such notice until FDA receives first an ANDA for review; instead, FDA's judicially-affirmed rule is and has been that the legally-required notice will be considered timely-provided only (and so long as) it is dispatched within 20 days after FDA's acknowledgement letter receiving a previously-submitted ANDA for review. *See, e.g.*, *Allergan, Inc. v. Actavis, Inc.*, Nos. 2:14-cv-638 & 2:14-cv-188, 2014 WL 7336692, *11-12 (E.D. Tex. Dec. 23, 2014) (affirming FDA's position). Teva's P-IV amendment therefore informed FDA that the company would send the legally-required notice to Allergan and the '111 patentees once FDA reversed its RTR decision and received Teva's ANDA for review. *See* P-IV Amendment at 2.

37.  On June 25, 2015 (some 29 months after Teva submitted its original ANDA to FDA), the Agency rescinded its RTR Letter—declaring that Teva's ANDA in fact had been substantially complete from the outset and concluding "that ANDA 203880 may be received for review as of January 23, 2012 (i.e., the original submission date)." Letter from J. Young to Teva (the "Rescission Letter") at 1 (June 25, 2015). As FDA explained: "FDA has determined that the RTR decision

erroneously was made [based upon a] product-specific bioequivalence (BE) guidance Draft guidance on Cyclosporine, which was not publicly available at the time of ANDA submission." *Id*. at 1. FDA subsequently issued a formal letter acknowledging the receipt of Teva's ANDA, Letter from V. Phung to Teva (the "Acknowledgement Letter") (July 9, 2015), and Teva timely notified Allergan and the '111 patentees of its Paragraph IV certification. *See* Letter from C. Wohlbach to FDA (the "Patent Amendment"), at 1 (Sept. 8, 2015) (confirming that Teva dispatched its notices on July 22, 2015 and that Allergan received Teva's notice on July 23, 2015). Allergan then sued Teva for infringing the '111 patent—meaning that Teva not only assumed the risks associated with the submission and notice of its Paragraph IV certification, but in fact realized the very risks that 180-day exclusivity is intended to reward. *Allergan, Inc. v. Teva Pharms. USA, Inc.*, No. 2:15-cv-01455 (E.D. Tex. filed Aug. 24, 2015).[2]

### 3. FDA Proceedings Concerning 180-Day Exclusivity For Cyclosporine ANDAs

38. On July 28, 2015, FDA opened a docket regarding 180-day exclusivity for ANDAs referencing Restasis®. Letter from T. Jetton to ANDA Applicants for Cyclosporine Ophthalmic Emulsion (the "Cyclosporine Comment Request"), FDA Docket No. 2015-N-2713 (July 28, 2015). In particular, the Agency for the first time disclosed that at least one ANDA applicant had attempted to submit a Paragraph

---

[2] Allergan subsequently obtained several additional patents on Restasis®, which Teva likewise challenged by Paragraph IV certification. Those patents ultimately were added to Allergan's lawsuit, but are not relevant here.

IV certification to the '979 patent before January 14, 2014 (*i.e.*, the date Allergan listed the '111 patent in the Orange Book and Teva submitted its Paragraph IV certification), "[b]ut the '979 patent expired before FDA issued an Acknowledgement Letter to any applicant with a pending ANDA." *Id*. at 3-4.  Because this so-called "'979 Applicant" never notified Allergan of its certification before that patent expired, FDA asked cyclosporine ANDA applicants whether the '979 Applicant may have qualified for 180-day exclusivity despite failing to provide the legally-required notice. *Id*. at 4.

39.    The fact that FDA asked that question in July 2015 was puzzling.  As set forth above, FDA proposed its MMA regulations in February 2015, and those proposed rules expressly and unambiguously provided that "first applicant" status hinges on providing the legally-required notice. *Supra* at ¶¶ 25-26.  But FDA had not yet finalized its proposed regulations at the time it opened this docket, and its request for comments thus ensured that any potentially-affected ANDA applicants would focus on that aspect of the Proposed Rule.  So along with its other comments on the Proposed Rules, Teva timely submitted comments to the cyclosporine docket that embraced FDA's proposal that "'[n]otice of paragraph IV certification in accordance with applicable regulations also is necessary for an ANDA applicant to be eligible for 180-day exclusivity.'"  Letter from M. Shumsky to M. Toufanian (the "Teva Cyclosporine Comments") at 8 (Sept. 28, 2015) (quoting 80 Fed. Reg. at 6862). As Teva explained: "Because the '979 Applicant(s) failed to provide a valid notice prior to the '979 patent's expiration, any putative paragraph IV certification that

the '979 Applicant(s) sent to FDA was incapable of grounding eligibility for exclusivity; it was a legal nullity given the absence of a valid notice." *Id.* at 10 (citing 80 Fed. Reg. at 6862).

### 4. FDA Promulgates Its MMA Regulations—And Then Reneges On Them

40. On October 6, 2016, FDA finalized its MMA-implementing regulations—expressly maintaining its proposed rule that eligibility for 180-day exclusivity hinges on the provision of a valid Paragraph IV notice to the brand manufacturer. *Supra* at ¶ 27. With FDA having made clear that the '979 Applicant could not have qualified for 180-day exclusivity, and thus that Teva had qualified for 180-day exclusivity by virtue of its Paragraph IV certification to the '111 patent, Teva prioritized its cyclosporine ANDA with the aim of launching the product, with exclusivity, at the earliest opportunity. On October 16, 2017, Teva won its patent litigation with Allergan—securing a district court decision declaring Allergan's asserted patents to be invalid and thereby opening the market to competition years before those patents were set to expire. *Allergan, Inc. v. Teva Pharms. USA, Inc.*, Case No. 2:15-cv-1455-WCB, 2017 WL 4803941 (E.D. Tex. Oct. 16, 2017) (Bryson, Cir. J., sitting by designation).[3] While Teva continued to work on perfecting its pending ANDA in proceedings before the Agency, Health Canada—FDA's Canadian counterpart—approved Teva's Canadian application in May 2018 for the same

---

[3] Allergan timely noticed an appeal to the U.S. Court of Appeals for the Federal Circuit, and that appeal remains pending. *Allergan, Inc. v. Teva Pharms. USA, Inc.*, Case No. 18-1130 (Fed. Cir. docketed Nov. 1, 2017).

formulation Teva is seeking to market here and Teva successfully launched its product as the first-approved generic version of Restasis® in Canada. Given the success of that launch, Teva ramped up its production in anticipation of an imminent U.S. approval with 180-day marketing exclusivity, in full accordance with FDA's now-effective MMA regulations. *See* Decl. of C. Groff ¶ 12 (the "Groff Decl.," attached as Exh. A).

41.     On July 13, 2018, however, FDA blindsided Teva by issuing a letter decision in another matter holding that ANDA applicants can qualify for 180-day exclusivity even if they never provide the brand manufacturer with the legally-required notice of a putative Paragraph IV certification. Letter from C. Pruitt to ANDA Applicants for Buprenorphine and Naloxone Sublingual Film (the "Letter Decision") at 12 (July 13, 2018) (attached as Exh. B). There, as here, a generic applicant submitted a Paragraph IV certification to a listed patent before any other applicant had done so, but never provided the brand manufacturer with notice of its putative Paragraph IV certification. *Id.* at 6. In addressing whether that applicant nonetheless qualified for 180-day exclusivity, FDA initially conceded that its MMA regulations expressly maintained the Agency's longstanding position that eligibility for 180-day exclusivity requires timely notice of the exclusivity-qualifying Paragraph IV certification. *Id.* at 8 & n.35 (quoting MMA Final Rule, 81 Fed. Reg. at 69608-10, 69617). But FDA quickly dismissed that fact on the ground that the MMA regulations principally addressed cases in which a Paragraph IV certification was submitted *via* amendment to an ANDA rather than in an original ANDA, *id.*—

even though exclusivity can be awarded only to a "first applicant," even though the MMA defines "first applicant" without regard to whether the potentially-exclusivity-qualifying certification is contained in an original ANDA or submitted *via* amendment, *see* 21 U.S.C. § 355(j)(5)(B)(iv)(II)(bb), and even though the Agency's decision went on to adopt the same rule for both amended ANDAs and original ANDAs. *See* Letter Decision at 9-10.

42. On the merits, FDA asserted that its new rule was more consistent with the statute's language than its duly-promulgated MMA regulations because the MMA's definition of "first applicant" allegedly provides that

> there can only ever be one "first day on which a substantially complete application containing a paragraph IV certification … is submitted," ***regardless of whether the applicant that submits its application (or an amendment or supplement to its application) on that "first day" gives or fails to give timely notice of and/or otherwise lawfully maintains its paragraph IV certification***.

*Id*. at 9 (emphasis added). FDA further asserted that its new rule was more "consistent with the structure of the MMA" because the statute elsewhere provides that 180-day exclusivity does not "roll" to a subsequent applicant after the "first applicant" loses its eligibility for 180-day exclusivity. *Id*. at 10-11.

43. Given the unavoidable implication of that decision for Teva's cyclosporine exclusivity in light of the '979 Applicant's failure to notify Allergan of its Paragraph IV certification, this lawsuit follows. *See Teva v. Sebelius*, 595 F.3d at 1308-15 (holding that an alleged first applicant can obtain pre-enforcement judicial review of a precedential letter decision regarding FDA's 180-day exclusivity rules).

## CAUSE OF ACTION
### *(Violations of the APA and FDCA)*

44.   Teva repeats and incorporates by reference the allegations contained in paragraphs 1-43 above.

45.   It is well settled that "an agency seeking to repeal or modify a legislative rule promulgated by means of notice and comment rulemaking is obligated to undertake similar procedures to accomplish such modification or repeal." *Am. Fed'n of Gov't Emps., AFL-CIO v. Fed. Labor Relations Auth.*, 777 F.2d 751, 759 (D.C. Cir. 1985). Accordingly, once an agency promulgates a rule through notice-and-comment rulemaking, it can undo the rule only through notice-and-comment rulemaking. *Cent. Texas Tel. Co-op., Inc. v. FCC*, 402 F.3d 205, 211 (D.C. Cir. 2005) ("If a 'second rule repudiates or is irreconcilable with [a prior legislative rule], the second rule must be an amendment of the first; and, of course, an amendment to a legislative rule must itself be legislative.'") (quoting *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1109 (D.C. Cir. 1993), with alterations in original).

46.   That rule controls here. After a multiyear notice-and-comment-rulemaking process, FDA formally promulgated legislative rules implementing the MMA's 180-day exclusivity, first-applicant, and Paragraph IV notice provisions through notice-and-comment rulemaking. FDA detailed its considered views in its February 2015 Proposed Rule, where it addressed qualification for 180-day exclusivity under the MMA and expressly confirmed its longstanding rule that

"[n]otice of paragraph IV certification in accordance with applicable regulations also is necessary for an ANDA applicant to be eligible for 180-day exclusivity based upon a paragraph IV certification."  80 Fed. Reg. at 6862.  The Agency then received scores of comments on the proposed rules, including comments relating to the definition of "first applicant."  *See* MMA Final Rule, 81 Fed. Reg. at 69580, 69591, 69594–95 (summarizing comments).  And while its proposed rules were pending, FDA solicited and received additional comments about this issue, from the applicants it knew would be affected by its final rule in this particular matter.  *See* Cyclosporine Comment Request and Docket No. FDA-2015-N-2713.

47.  After considering the entirety of the record it assembled, FDA promulgated a final rule that explicitly and unambiguously maintained the Agency's longstanding rule that applicants are "required to []send notice within the required timeframe after the … ANDA has been … received" in order "to qualify for 180-day exclusivity."  *Id*. at 69609.  Having thus promulgated final rules through notice-and-comment rulemaking, in which it unambiguously declared that an ANDA applicant cannot qualify for 180-day exclusivity unless it sends the legally-required notice of its Paragraph IV certification, FDA could not lawfully retreat from that position without conducting a new round of notice-and-comment rulemaking.  *See, e.g., Cent. Texas Tel. Co-op.*, 402 F.3d at 211.

48.  Even so, FDA's Letter Decision adopted precisely the opposite position from the one taken in its MMA regulations—namely, that notice of a Paragraph IV certification is ***not*** required to qualify for 180-day exclusivity, and that the first

ANDA applicant which submits a Paragraph IV certification to its substantially complete ANDA qualifies for 180-day exclusivity "regardless of whether the applicant that submits its application (or an amendment or supplement to its application) on that first day gives or fails to give timely notice of and/or otherwise lawfully maintains its paragraph IV certification." Letter Decision at 9 (internal quotation omitted).

49.     FDA's Letter Decision therefore was issued "without observance of procedure required by law," 5 U.S.C. § 706(2)(D), and Teva is entitled to both declaratory and injunctive relief barring FDA from taking any action to enforce or apply its Letter Decision. *Id*. § 706(2); *see also* 28 U.S.C. § 2201(a); *id*. § 2202.

50.     FDA's Letter Decision violates the APA decisionmaking requirements in a second way: In abrogating the Agency's MMA's regulations, it failed to mention—much less consider—the affected parties' reliance interests. That is fatal. While "[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change" and "'show that there are good reasons for the new policy,'" they must also "be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125–26 (2016) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). "[A]n '[u]nexplained inconsistency' in agency policy" is "arbitrary and capricious" by definition. *Id*. at 2126 (quoting *Nat'l Cable & Telecomm. Assn. v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)); *see also Fox Television*, 556 U.S. at 515 ("An agency may not, for

example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books.") (citing *United States v. Nixon*, 418 U.S. 683, 696 (1974)).

51.     FDA failed to account for those interests here.  For nearly two decades, the Agency consistently has conditioned eligibility for 180-day exclusivity on the first applicant's delivery of a valid Paragraph IV notice to the brand manufacturer and patentees.  *See supra* at ¶¶ 22-23.  And for more than a decade, the courts have embraced that rule.  *See, e.g.*, *Purepac*, 354 F.3d 877.  This rule's longstanding pedigree in turn has engendered weighty reliance interests.  As set forth above, 180-day exclusivity plays a crucial role in the Hatch-Waxman scheme by incentivizing generic applicants to assume risks they otherwise might forego—namely, to subject themselves to years of costly patent litigation based on the prospect of an exclusive launch.  *Teva v. Sebelius*, 595 F.3d at 1318 (explaining that 180-day exclusivity is designed "to induce challenges to patents … by the promise of a reward for generics that stick out their necks (at the potential cost of a patent infringement suit).").  This longstanding and repeatedly-reaffirmed rule in turn has assured applicants like Teva that the exclusivity reward they earned by "sticking out their necks … at the potential cost of a patent infringement suit," *id*., cannot be undone by a stealth applicant who never notifies the brand manufacturer of its patent challenge and so assumes none of the risks Congress sought to reward (and Teva actually realized).

52.     FDA cast no doubt on the vitality of its longstanding approach in the 10-plus years between the MMA's enactment in 2003 and Teva's submission of a Paragraph IV certification to the '111 patent in January 2014.  And any abstract

questions that could have been raised were settled during FDA's MMA notice-and-comment rulemaking—when its Proposed Rule expressly re-affirmed FDA's longstanding position (even citing *Purepac* for support, 80 Fed. Reg. at 6835), and its Final Rule formally maintained that position after receiving comments both in the cyclosporine docket and in response to the Proposed Rule.   81 Fed. Reg. at 69610.

53.     Interested parties thus had every reason to think this issue was settled and proceed accordingly.  For Teva, that meant prioritizing its cyclosporine ANDA at all costs.  As set forth in the accompanying Declaration of Carrie Groff, Teva not only placed significant "orders for supplies and components necessary to support the launch of its generic Restasis® product with 180-day exclusivity," but "made significant investments to expand its production capacity at the planned manufacturing site for this product—including the design, build, installation, qualification, and validation of an additional production line that was required to support an exclusive launch for generic Restasis® and which Teva purchased in reliance on FDA's longstanding position and recently promulgated regulations regarding 180-day exclusivity."  Groff Decl. ¶ 11.  Moreover, Teva diverted legal, regulatory, planning, and management resources from other matters to focus on launching its generic Restasis® product with exclusivity, even "alter[ing] its plans for at least one other product in order to focus its limited resources and plant capacity on producing sufficient quantities of generic Restasis® to support a launch of this product with 180-day exclusivity."  *Id*. at ¶ 12.

54.     Yet FDA's sudden decision to jettison decades of recently-reaffirmed precedent yanked the rug out from under Teva without even mentioning the significant reliance interests its longstanding policy had engendered, much less "tak[ing] into account" those interests and "show[ing] that there are good reasons for" retroactively applying its new rule to events that were set in motion years earlier.  *Encino Motorcars*, 136 S. Ct. at 2125-26 (internal quotations omitted). FDA's failure to comply with this aspect of the APA's decisionmaking requirements independently entitles Teva to both declaratory and injunctive relief barring FDA from taking any action to enforce or apply its Letter Decision.  *Id.* § 706(2); *see also* 28 U.S.C. §§ 2201(a), 2202.

55.     Finally, FDA's Letter Decision conflicts with the plain text, broader incentive structure, and legislative intent of the FDCA and therefore is "arbitrary, capricious, an abuse of discretion of otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), and/or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  *Id.* § 706(2)(C).  As set forth above, the MMA requires a generic applicant to do three things in order to become a "first applicant" that is eligible for 180-day exclusivity: It must "[1] submit[] a substantially complete application that [2] contains and [3] lawfully maintains a [Paragraph IV] certification."  21 U.S.C. § 355(j)(5)(B)(iv)(II)(bb) (defining "first applicant"); *see also id.* § 355(j)(5)(B)(iv)(I) (awarding exclusivity only to a "first applicant").  By linking these requirements with the conjunctive word "and," the MMA's plain language makes clear that an applicant can qualify for 180-day exclusivity only if it satisfies

*each* of these conditions—and, thus, that an ANDA applicant who fails to complete *any* one of those three steps cannot be a "first applicant" that qualifies for exclusivity. *See, e.g.*, *Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 527-28 (2007) (reading the word "and" conjunctively and explaining that any alternative reading "would make no sense"); *Crooks v. Harrelson*, 282 U.S. 55, 58 (1930) (explaining that Congress's use of the word "and" is conjunctive "in its ordinary sense").

56. That means an ANDA applicant seeking to qualify for 180-day exclusivity as a "first applicant" must do more than merely (1) submit a substantially complete ANDA that (2) contains a Paragraph IV certification. It must also (3) "lawfully maintain" that Paragraph IV certification. Any other approach writes the "lawful maintenance" requirement out of the statute and thereby violates the cardinal rule of statutory interpretation: that "a statute should be construed so that effect is given to all of its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009) (internal quotation and alteration omitted); *see also N.L.R.B. v. SW General, Inc.*, 137 S. Ct. 929, 941 (2017) (rejecting agency's interpretation of a three-part statutory standard because it "makes the first requirement superfluous, a result we typically try to avoid") (citing *Williams v. Taylor*, 529 U.S. 362, 404 (2000) ("It is ... a cardinal principle of statutory construction that we must give effect, if possible, to every clause and word of a statute.") (internal quotation marks omitted)).

57.    There is no dispute over what it takes to "lawfully maintain" a Paragraph IV certification: The applicant must comply with all requirements for Paragraph IV certifications, including the legal requirement to notify the brand manufacturer and patentees of its certification.  Again, the Agency has made that clear for more than a decade.  *See, e.g.*, Gabapentin Letter Decision at 7 ("[T]he statute makes the first applicant to submit a paragraph IV certification to a patent eligible for exclusivity, ***and it also requires that the ANDA applicant give notice [of its certification]***.") (emphasis added).  And nothing in the MMA alters or undermines those legal requirements.  Just as the original statute required applicants to notify the brand manufacturer and patentee(s) of their Paragraph IV certifications, the MMA requires applicants to do so.  21 U.S.C. § 355(j)(2)(B).  And just as the rest of the original statute turned on the applicant's notice, so too does the MMA.  *See, e.g.*, *id.* § 355(j)(5)(B)(iii) (30-month stay in brand-initiated patent infringement litigation pegged to receipt of notice); *id.* § 355(j)(5)(C)(i)(I)(aa) (ANDA applicant cannot file declaratory judgment action until notice has been provided and the 45-day automatic stay clock expires); 35 U.S.C. § 271(e)(5) (same).

58.    Despite the plain language of the MMA's "first applicant" definition, and notwithstanding the fact that the MMA's broader Paragraph IV scheme is pegged to delivery of the legally-required notice (and indeed can function only if such notice is provided), FDA's Letter Decision held that the first applicant who submits a Paragraph IV certification to the Agency qualifies for 180-day exclusivity "regardless of whether the applicant … gives or fails to give timely notice of and/or

otherwise lawfully maintains its paragraph IV certification."  Letter Decision at 9; *see also id*. at 6 (holding that applicant "qualified as a 'First Applicant'" even though "it had not given notice to the NDA holder or patent owner").

59.    The rule set forth in FDA's Letter Decision not only conflicts with the text and structure of the statute; it undermines the clear legislative intent underlying the 180-day exclusivity reward.  As this Complaint has taken pains to explain, the whole point of the statute's intertwined patent-submission, patent-listing, Paragraph IV certification, Paragraph IV notice, patent-litigation, and 180-day exclusivity provisions is to incentivize generic applicants to take the risks necessary to lift the shadow of uncertainty cast by an innovator's patents and, where an applicant's challenge succeeds, break the patent logjam so that generic competition can begin before the innovator's patents otherwise would allow.  *Teva v. Sebelius*, 595 F.3d at 1318 (explaining that 180-day exclusivity "is a pro-consumer device [that] Congress has chosen to induce challenges to patents claimed to support brand drugs [by] reward[ing] generics that stick out their necks (at the potential cost of a patent infringement suit)"); *Teva v. Leavitt*, 548 F.3d at 106 ("The legislative purpose underlying paragraph IV is to enhance competition by encouraging generic drug manufacturers to challenge the patent information provided by NDA holders in order to bring generic drugs to market earlier.").

60.    FDA's Letter Decision turns the statute's incentive structure upside down.  Despite the courts' longstanding recognition that the whole point of Hatch-Waxman's exclusivity regime is to reward applicants who risk litigation, FDA's

Letter Decision (A) rewards applicants who do not comply with the statute's requirements, assume no risk of litigation from their actions, and thus cannot do what the statute is designed to do, with eligibility for 180-day exclusivity, while (B) denying that reward to an applicant which, like Teva here, does precisely what the statute requires before anyone else, successfully breaks the patent logjam, and opens the market to early generic competition.   That is why, until now, FDA consistently maintained that 180-day exclusivity hinges on the submission of a valid Paragraph IV certification and corresponding notice to the innovator (including in its MMA rulemaking).   And it is why, to this day, FDA has not articulated any explanation for why abandoning its longstanding position comports with the statute's whole text, its incentive structure, and unmistakable legislative intent.

61.   Despite the procedural and substantive flaws in its Letter Decision, FDA already has applied that Decision to divest Teva of its statutory right to 180-day exclusivity for at least one other ANDA product, and there is no question that, absent the declaratory and injunctive relief requested herein, its Letter Decision vitiates Teva's right to 180-day marketing exclusivity for this product.   Teva thus will suffer substantial and irreparable harm absent the granting of the requested relief, in the form of a lost statutory right, lost sales and decreased market share. Indeed, as both this Court and the D.C. Circuit have recognized, immediate judicial review of the Letter Decision and the entry of the declaratory and injunctive relief requested in this Complaint are imperative precisely because "'a first applicant's

loss of its statutory entitlement to the 180–day exclusivity period is irreparable because once lost 'it cannot be recaptured.'" *Mylan*, 910 F. Supp. 2d at 313 (quoting *Apotex*, 2006 WL 1030151, at *17, *aff'd*, 449 F.3d 1249 (D.C. Cir. 2006)); *Teva v. Sebelius*, 595 F.3d at 1311 (explaining that "the exclusivity reward … is time-sensitive" and that "'loss of [the] officially sanctioned head start [is] an injury that would not be remediated by [its] securing 180 days of exclusivity later on") (internal quotation omitted).

## PRAYER FOR RELIEF

WHEREFORE, Teva respectfully requests that this Court:

A.  **DECLARE** that FDA's Letter Decision was issued without observance of procedure required by law and otherwise is arbitrary, capricious, an abuse of discretion and not in accordance with law;

B.  **DECLARE** that Teva's Restasis®-referencing ANDA No. 203880 is entitled to 180-day exclusivity;

C.  **ENJOIN** FDA from approving any ANDA that references Restasis® as the RLD and was not substantially complete as of January 14, 2014 and/or for which the ANDA's sponsor did not submit a lawfully-maintained Paragraph IV certification on January 14, 2014; and

D.  **GRANT** such further relief as the Court may deem just and proper.

Dated: October 17, 2018          Respectfully submitted,

                    /s Michael D. Shumsky
                    Michael D. Shumsky (D.C. Bar No. 495078)
                    Subash Iyer (D.C. Bar No. 1045090)
                    KIRKLAND & ELLIS LLP
                    655 15th Street N.W., Suite 1200
                    Washington, D.C.  20005
                    (202) 879-5000
                    (202) 879-5200 fax

                    Jay P. Lefkowitz, P.C. (D.C. Bar No. 449280)
                    KIRKLAND & ELLIS LLP
                    601 Lexington Ave.
                    New York, NY  10022
                    (212) 446-4800
                    (212) 446-4900 fax

                    *Counsel for Teva Pharmaceuticals USA, Inc.*

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 17th day of October, 2018, he caused a copy of the foregoing **COMPLAINT** to be served upon the following attorneys by electronic mail.

> Robert P. Charrow
> General Counsel
> U.S. Department of Health and Human Services
> 200 Independence Ave., S.W.
> Room 713-F
> Washington, D.C. 20201
> (202) 690-7741
> robert.charrow@hhs.gov
>
> *Counsel for Defendant Alex M. Azar II*
>
> Stacy Cline Amin
> Chief Counsel, U.S. Food and Drug Administration
> 10903 New Hampshire Ave.
> Building 31, Room 4536
> Silver Spring, MD  20993-0002
> stacy.amin@fda.hhs.gov
>
> *Counsel for Defendants Scott Gottlieb, M.D. and FDA*

Formal service on all required parties will follow once the Clerk signs and returns the summonses that are being submitted simultaneously with the filing of this **COMPLAINT**.

/s Michael D. Shumsky

Michael D. Shumsky
*Counsel for Teva Pharmaceuticals USA, Inc.*